UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM COONROD,

               Plaintiff,

v.

UNKNOWN SHERMAN, *et al.*,

               Defendants.

_____/

Case No. 1:16-cv-407

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a former state prisoner in the custody of the Michigan Department of Corrections (MDOC) pursuant to 42 U.S.C. § 1983.[1]  This matter is now before the Court on two motions for summary judgment.  The first motion was filed by defendants Corrections Officer (CO) Ed Eklin (named as "Ecklin"), CO Troy Sherman, Deputy Warden David Pratt, CO Kevin Douglas, CO Thad Saur (named as "Sour"), CO Lincoln Wilson, CO Paul Kingsley, Sgt. Juanita Zaborowski, CO Adam Bourque, CO Patrick Hansen, CO Michael Sobeck, Nurse Kimberly Dunning-Meyers (named as "Myers"), Registered Nurse (RN) Caitlin Buren, and Dr. William Borgerding (named as "Bogerding") (collectively referred to as the "MDOC defendants") (ECF No. 180).  The second motion was filed by defendants Corizon Health, Inc. ("Corizon"), Shi Yu Tan, M.D., Terrance Whiteman, M.D., and Jeffrey Bomber, D.O. (collectively referred to as the "Corizon defendants") (ECF No. 183).

---

[1] The Court notes that while plaintiff was incarcerated at the time he filed this action, he is no longer in prison and lives in Kent City, Michigan.  *See* Change of address (June 25, 2018) (ECF No. 196).

## I.    Background

Plaintiff filed a complaint against 23 defendants arising from injuries he sustained when other prisoners attacked him on April 26, 2014 while he was incarcerated at the Pugsley Correctional Facility (MPF).  Compl. (ECF No. 1).  According to medical records on that date, plaintiff was hit in the head "with what he believes was a padlock in a sock."  Munson Medical Center Records (sometimes referred to as "Munson Hospital") (April 26, 2014) (ECF No. 1-2, PageID.75).  In his complaint, plaintiff alleged:  that MPF personnel failed to protect him from the April 26, 2014 attack; that MPF personnel failed to provide him with medical treatment immediately after the attack; that MDOC personnel at the MDOC's Duane Waters Hospital (DWH) failed to provide him with adequate medical care in April and May 2014; and that while plaintiff had two eye surgeries at the University of Michigan in August and September, 2014, MDOC officials had not yet provided a recommended third eye surgery.  *See* Compl. (ECF No. 1).  As discussed, *infra*, the medical records reflect that plaintiff's eye surgeries occurred in July and August, 2014.[2]

Plaintiff's complaint set forth 25 counts.  Counts 1, 2, 3, 4, 5, 6, 7, 8, 10, 15, 16, and 17 alleged that defendants MPF Warden Harry, Deputy Warden Pratt, Capt. Pant, Capt. Snow, CO Sherman, CO Douglas, CO Saur, CO Wilson, CO Eklin, CO Kingsley, Sgt. Zaborowski and CO Bourque violated plaintiff's Fourteenth Amendment rights by failing to prevent the attack.

Counts 8, 9, 11, 12, 13 and 14, alleged that MPF personnel RN Buren,  Sgt. Zaborowski, CO Bourque, CO Hansen and CO Sobeck violated plaintiff's Eighth Amendment rights by being deliberately indifferent to his serious medical needs immediately after the attack.

---

[2] In his complaint, plaintiff alleged that he "had been scheduled for a third surgery by his treating physicians / specialists at U of M hospital, but he has not received the surgery."  Compl. at PageID.21.

Counts 18, 19 and 20 alleged that DWH personnel Dr. Tan, Dr. Pandya, and Nurse Dunning-Meyers violated plaintiff's Eighth Amendment rights by being deliberately indifferent to his serious medical needs while he was at the hospital in April and May 2014.

Counts 21, 22 and 23 alleged that Drs. Bomber, Borgerding and Whiteman were supervising medical doctors for the MDOC and Corizon commencing in 2014, and as "gate keepers" prevented plaintiff from receiving his necessary eye surgeries.

Count 24 alleged that Corizon violated plaintiff's Eighth Amendment rights by delaying and refusing treatments for plaintiff.

Finally, Count 25 alleged that the MDOC violated plaintiff's Fourteenth and Eighth Amendment rights.

After an initial review of the complaint, the Court dismissed defendants Capt. Pant, Capt. Snow, Warden Harry and the MDOC, and authorized service on the remaining 19 defendants. Opinion and Order (ECF Nos. 2 and 3).   Plaintiff voluntarily dismissed Dr. Pandya.  Order (ECF No. 169).

Plaintiff's claims which survived screening fall into four categories.  First, plaintiff alleged that MPF personnel failed to protect him from the April 26, 2014 attack.  Second, plaintiff alleged that MPF personnel failed to address his medical concerns immediately after the attack. Third, plaintiff alleged that DWH personnel failed to provide medical care in the days following the attack.  Fourth, plaintiff alleged that DWH personnel failed to provide followup care, including authorization of a third eye surgery.

Defendants moved for summary judgment for lack of exhaustion.  The Court granted that motion in part and dismissed plaintiff's "gate-keeping" claims against defendants Corizon, Drs.

Bomber, Dr. Borgerding and Dr. Whiteman with respect to the third eye surgery alleged in Counts 21, 22 and 23. *See* Order adopting R&R (ECF No. 49). The Court also dismissed plaintiff's "gate-keeping claim" against Dr. Tan, which was arguably alleged as part of Count 19. *Id.* Defendants have moved for summary judgment on the remaining claims.

## II.    Defendants' motions for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

4

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the Court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff has made no effort to respond to the specific arguments raised in defendants' motions for summary judgment.  Rather, plaintiff filed a one-page response to both motions in which he simply "adopts and incorporates by reference his previous arguments" set forth in ECF Nos. 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116 and 118 as well as affidavits filed as ECF Nos. 121 and 124, and other documents identified as ECF Nos. 139, 140, 142 and 143.  *See* Response (ECF No. 189).  Plaintiff pointed out that the Court had not yet ruled on his motion to reinstate and re-file a subpoena directed against the MDOC and a motion to compel (ECF Nos. 170 and 172).

The Court ruled on plaintiff's motions to compel and to reinstate the subpoena in an order entered on April 12, 2018 (ECF No. 193).  In that order, the Court denied the motion to compel and granted his motion to reinstate portions of the subpoena directed against the MDOC. As part of the relief granted to plaintiff the Court ordered the MDOC to produce copies of the requested documents by not later than May 3, 2018 and to allow plaintiff to view a video of the event (if such a video existed) by May 3, 2018.  The Court also allowed plaintiff to supplement his response to the motions for summary judgment by no later than May 31, 2018.  *See* Order (ECF No.

193, PageID.3209-3210).  Defendants and the MDOC filed a response regarding compliance with the Court's order and an affidavit stating that there was no video of the incident because MPF did not have security cameras in the housing units.  *See* Non-party MDOC's Response to subpoena (ECF No. 194); Notice (ECF No. 195).

Plaintiff did not file a supplemental response to defendants' motions. Plaintiff's one-page response, which refers to hundreds of pages of previously filed papers, is not an adequate response to defendants' motions for summary judgment.  The parties have filed over 3,000 pages of papers in this action.  It is not for this Court to review plaintiff's previous filings to develop arguments in opposition to defendants' motions.  *See generally*, *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405, 407 (6th Cir. 1992) (when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact).  Plaintiff did, however, file a "verified complaint" pursuant to 28 U.S.C. § 1746. Because a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment, *see Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993), the Court will consider the relevant portions of plaintiff's verified complaint as an affidavit in opposition to defendants' motions for summary judgment, along with the 85 pages of exhibits referenced in and attached to the complaint.

**B.     Plaintiff's claim that the MDOC defendants failed to protect him from being attacked by another prisoner**

**1.     Legal standard**

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the

Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

While plaintiff alleged that defendants' failure to protect him violated his due process rights under the Fourteenth Amendment, his claim is properly viewed as a violation of the Eighth Amendment. As the Sixth Circuit recently observed, "the primary concern of the drafters of the Eighth Amendment was to proscribe tortures and other barbarous methods of punishment." *Rhinehart v. Scutt*, 894 F.3d 721, 736 (6th Cir. 2018), citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation marks and alterations omitted). In its prohibition of cruel and unusual punishments, the Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates." *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001), quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

"A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions[.]" *Farmer*, 511 U.S. at 844-45 (internal citations and quotation marks omitted). "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). *See, e.g., Gilland v. Owens*, 718 F. Supp. 665, 688 (W.D. Tenn. 1989) (observing that the violent tendencies of inmates is not within the control of jail officials).

However, "not all injuries suffered by an inmate at the hands of another prisoner result in constitutional liability for prison officials under the Eighth Amendment." *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1998). To establish an Eighth Amendment claim that a prison official failed to protect an inmate, the inmate must show that the official was deliberately indifferent "to a substantial risk of serious harm" to the inmate. *Id.* at 828; *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004). "To demonstrate deliberate indifference, an inmate must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene*, 361 F.3d at 294, *quoting Farmer*, 511 U.S. at 829, 847. "Generally, a single isolated attack on an inmate cannot give rise to a deliberate indifference claim because the inmate will be unable to show that officials were consciously aware of the risk of an attack." *McDuff v. Addis*, No. 1:17-cv-912, 2018 WL 3239491 at *3 (W.D. Mich. July 3, 2018) (citing *Lewis v. McLennan*, 7 Fed. Appx. 373, 375 (6th Cir. 2001) (which affirmed dismissal of an Eighth Amendment claim because the plaintiff had not alleged any specific facts which would show that he was in danger of being assaulted by other prisoners). Finally, because courts consider the reasonableness of a prison official's actions, the Supreme Court has instructed that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

### 2.    Plaintiff's allegations

Plaintiff has set forth similar allegations in Count 1 (CO Sherman), Count 2 (Deputy Warden Pratt), Count 3 (CO Douglas), Count 4 (CO Saur), Count 5 (CO Wilson) and Count 6 (CO Eklin).  In each of these counts, plaintiff has alleged a list of the seven reasons why the respective defendant violated his constitutional rights.  Each of the lists is similar to the following allegations in Count 1 (with minor deviations):

> Between March 27, 2014 and April 26, 2014, [defendant] . . . failed to protect Plaintiff . . . because he: (i) Was personally aware Plaintiff was experiencing thefts of his property, including his fan, food and shoes; (ii) Was personally aware that Plaintiff had requested to be moved to another housing unit several times for safety and security reasons; (iii) Was personally aware that Plaintiff had been targeted because he was convicted of a sex offense; (iv) Was personally aware that Plaintiff had received direct and specific threats against his life; (v) Was aware that Plaintiff was going to be assaulted if he did not get moved; (vi) Refused to move Plaintiff to a different housing unit; and  (vii) Refused to move guys [the persons] making threats to Plaintiff in the housing unit.

Compl. at PageID.22.  As discussed below, plaintiff has failed to present evidence to support these allegations against any of the defendants in Counts 1 through 6.  Finally, plaintiff makes somewhat different failure to protect claims in Count 7 (CO Kingsley), Count 8 (Sgt. Zaborowski), and Count 10 (CO Bourque).  The Court will address Counts 7, 8 and 10 separately.

### 3.    CO Sherman (Count 1)

In this complaint, plaintiff alleged that he was transferred to MPF on March 27, 2014 and that during his first week at the prison he "had some of his property stolen, including his shoes, fan and food." *Id*. at PageID.13.  Plaintiff alleged that he reported his property being stolen to CO Sherman "who generated an internal report about the incident." *Id*.  Plaintiff requested to be moved to another housing unit, but CO Sherman denied the request and instructed plaintiff "to send a kite to Deputy Warden Pratt, and request a move." *Id*. at PageID.14.  Plaintiff also alleged that during

another meeting with CO Sherman at an unspecified later date, "[p]laintiff provided him with the information about the persons who were stealing his property, but Sherman refused to move [p]laintiff to another housing unit." *Id*. at PageID.15.

In his interrogatory answers, CO Sherman denied that he ever had a conversation in which he instructed plaintiff to contact Deputy Warden Pratt to report thefts of his property, threats and his move request, or that plaintiff gave him a list of names of prisoners who were stealing his property and threatening him. *See* Sherman interrogatories (ECF No. 181-4, PageID.2394-2395). CO Sherman further stated that he did not routinely read prisoner files and had no knowledge of the facts surrounding their convictions, and that as a corrections officer, he made no decisions in the assignment of housing unit cells. *Id*. at PageID.2393.  Assuming that plaintiff reported thefts to CO Sherman and requested a move to a new housing unit, and that Sherman made an "internal report" about the incident,  there is no evidence that plaintiff ever disclosed the names of the individuals who stole his property, the individuals who threatened him, or the nature of the threat.   In summary, plaintiff has not established that CO Sherman was subjectively aware of the risk that plaintiff would be attacked on April 26, 2014 or that he disregarded that risk by failing to take reasonable measures to abate it. *See Farmer*, 511 U.S. at 829, 847; *Greene*, 361 F.3d at 294.    Accordingly, CO Sherman's motion for summary judgment should be granted.

### 4.    CO Douglas (Count 3)

Plaintiff alleged that after additional property was stolen, CO Douglas instructed him to write a list of names of the prisoners responsible for the thefts and who had been making threats against him, that CO Douglas "was aware of the threat to Plaintiff's safety, just from reporting the threats and thefts, but twice refused to transfer him to another housing unit." Compl. at PageID.14.

10

In his interrogatories, CO Douglas acknowledged plaintiff reported that his tennis shoes had been stolen and that he (Douglas) noted it:

> On April 21, 2014, prisoner Coonrod reported to me that his tennis shoes had been stolen three days prior. I logged that information for staff to be aware and look for them during shakedowns and prisoner movement. At no time did prisoner Coonrod inform me that he was being threatened.

Douglas Interrogatories (ECF No. 181-5, PageID.2401). CO Douglas admitted that he was aware that plaintiff's tennis shoes were stolen on April 18th and logged that information. While plaintiff stated that he was instructed to write down the names of the prisoners responsible for stealing his possessions and making threats against him, there is no evidence that plaintiff ever provided that information. The minimal facts presented by plaintiff do not establish that CO Douglas was subjectively aware of the risk that plaintiff would be attacked on April 26, 2014 or that he disregarded that risk by failing to take reasonable measures to abate it. *See Farmer*, 511 U.S. at 829, 847; *Greene*, 361 F.3d at 294. Accordingly, CO Douglas' motion for summary judgment should be granted.

### 5.    CO Saur (Count 4)

Plaintiff alleged that he met with CO Saur, a regular unit housing officer,  and informed him about the thefts and threats "as justification for a move to another housing unit," but Saur denied his transfer request. Compl. at PageID.14. CO Saur has acknowledged that "[w]hile there was an entry that his tennis shoes were stolen on April 21, 2014, there were no reports of threats." Saur Interrogatories (ECF No. 181-6, PageID.2407).  In addition, Saur stated that "Prisoner Coonrod  did not report to me that he was being threatened." *Id*. at PageID.2408. The minimal facts presented by plaintiff do not establish that CO Saur was subjectively aware of the risk that plaintiff would be attacked on April 26, 2014 or that he disregarded that risk by failing to take

11

reasonable measures to abate it.  *See Farmer*, 511 U.S. at 829, 847; *Greene*, 361 F.3d at 294.

Accordingly, CO Saur's motion for summary judgment should be granted.

### 6.    CO Wilson (Count 5)

Plaintiff alleged that a few days after his property was stolen and after meeting with

CO Saur, he met with "c/o Wilson", informed Wilson about the thefts and threats, and requested a

transfer to another housing unit. According to Coonrod, CO Wilson denied his transfer request and

three additional transfer requests, stating that it was hard to find good inmates.  Compl. (ECF No.

1, PageID.14).  Defendants contend that plaintiff served the wrong Wilson.[3] Plaintiff only identified

this defendant as "Correctional Officer Wilson" employed at MPF.  Defendant CO Lincoln Wilson

was the sally port officer at MPF.  Defendants point out that the sally port is a large non-pedestrian

entrance outside the prison complex where large delivery vehicles gain entry, including emergency

vehicles such as fire trucks. *See, e.g.,* MPF Operating Procedure 04.03.120-A, "Fire Department

Response".  CO Lincoln Wilson stated that as the sally port officer he had very little contact with

the prison population.  *See* Wilson interrogatories (ECF No. 181-3, PageID.2386). In light of his

duties as the sally port officer, CO Lincoln Wilson stated that he would not be involved in the

assignment of housing unit cells; was not involved in any protection requests in 2013 or 2014; and,

never made a statement to Coonrod that good inmates are hard to find.  *Id*. at PageID.2387-2389.

Based on this record, it appears that plaintiff has served the wrong CO Wilson.  Accordingly,

defendant CO Lincoln Wilson's motion for summary judgment should be granted.

---

[3] The Court notes that defendants state in their brief that "Despite knowing in April of 2017 that he had served his Complaint on the wrong C/O Wilson, Coonrod has done nothing to rectify his mistake." Defendants' Brief (ECF No. 181, PageID.2359).

6.    **CO Eklin (Count 6)**

Plaintiff alleged that in "mid-April of 2014," his wife, Suzanne D. Coonrod, met with CO Eklin at the front desk of MPF after a visit with plaintiff.  Compl. at PageID.14.  At that time, Mrs. Coonrod informed Eklin "of the thefts, threats and denied move requests."  Compl. at PageID.15.  In response, CO Eklin "told Plaintiff's wife that Plaintiff 'had to put his 'big boy' pants and deal with it himself.'"  *Id.* at PageID.15.

Plaintiff's complaint included an affidavit from Mrs. Coonrod which stated:  that she traveled to Kingsley, Michigan to visit plaintiff at MPF "[b]etween March 27 and April 26 of 2014;" that during the visit, plaintiff informed her that he had been requesting a transfer to another housing unit because "he was experiencing the loss of his personal property due to theft;" "that he had spoken to several unit officers and command staff" and sent a memorandum to Deputy Warden Pratt informing him of the problem and requesting a move.  Suzanne Coonrod Aff. (ECF No. 1-1, PageID.45).  Mrs. Coonrod then recounted a conversation with CO Eklin:

> 8. At the conclusion of our visit, I spoke to a corrections officer in the front lobby, which I identified as C/O Ecklin.
>
> 9. I informed Officer Ecklin that my husband needed to be moved out of his current housing unit, as his property was being stolen on a consistent basis.
>
> 10. Officer Ecklin informed me that my husband "had to put on his 'big boy' pants and deal with it himself["].

*Id.*

CO Eklin stated that as the front desk officer in the administration building, he had very little contact with the prisoner population, and would not be involved in the assignment of housing unit cells.  Eklin Interrogatories (ECF No. 181-7, PageID.2412, 2414).  Eklin further stated:

13

Although I've never received family member complaints concerning imminent threats to a prisoner's health, safety or security, such complaints would have been immediately reported to my shift commander.

*Id*.

Based on this record, there is no evidence that Mrs. Coonrod advised CO Eklin that plaintiff received any threats to his safety. Even if the conversation occurred as recounted by Mrs. Coonrod, plaintiff has failed to demonstrate that CO Eklin was deliberately indifferent for failing to protect plaintiff from the April 26, 2014 attack. Like plaintiff's verified statements, Mrs. Coonrod's affidavit contains little factual information. The affidavit is vague as to the date when the alleged conversation occurred (i.e., sometime between "[b]etween March 27 and April 26 of 2014") and while Mrs. Coonrod stated that she informed CO Eklin about thefts of plaintiff's property, there is nothing in the affidavit to support plaintiff's claim that Mrs. Coonrod told CO Eklin about threats made against plaintiff. Plaintiff has not presented any evidence that CO Eklin was subjectively aware of the risk that plaintiff would be attacked on April 26, 2014 or that he disregarded that risk by failing to take reasonable measures to abate it. *See Farmer*, 511 U.S. at 829, 847; *Greene*, 361 F.3d at 294. Accordingly, defendant Eklin's motion for summary judgment should be granted.

### 7.    Deputy Warden Pratt (Count 2)

Plaintiff alleged that he wrote a kite to Deputy Warden Pratt requesting to be moved to "a safer housing unit" but the deputy warden did not respond to his kite "despite having the information about the thefts, threats and requested move." Compl. at PageID.14. Plaintiff gave no information on the date he wrote this kite, other than stating that he wrote it the same day that he reported the theft to CO Sherman, and that he wrote the kite after meeting with Sherman. *Id*. at

14

PageID.13-14.  Plaintiff also alleged that he wrote a second kite to Deputy Warden Pratt on the evening of Friday, April 25, 2014 (the evening before the attack), this time informing him of threats and continued thefts of property and that he "begged" Pratt move him to another housing unit.  *Id.* at PageID.15.

In his affidavit, Deputy Warden Pratt stated that he did not recall receiving a kite from plaintiff in late March 2014 or on the night of April 25, 2014 requesting to be moved to another housing unit.  Pratt Aff. (ECF No. 181-8, PageID.2419).  With respect to the second kite, Pratt stated that he was not present at MPF during the third shift on Friday, April 25, 2014, and was not scheduled to return until the following Monday (April 28, 2014).  *Id.* at PagID.2418.  Pratt further stated that he reviewed all records, including emails, and found no request for a transfer or protection.  *Id.* at PageID.2419.  Given this record, an issue of fact exists as to whether plaintiff sent the kites, and, if so, the contents of the kites.  That being said, plaintiff has failed to establish that Deputy Warden Pratt failed to protect him.  As discussed, plaintiff has not alleged that he gave defendants any specific information regarding the threats or the identities of the prisoners making the threats.  In addition, even if plaintiff had sent a kite to Deputy Warden Pratt on the evening of April 25th, Pratt was not present at MPF to respond to the kite.  The minimal facts presented by plaintiff do not establish that Deputy Warden Pratt was subjectively aware of the risk that plaintiff would be attacked on April 26, 2014 or that he disregarded that risk by failing to take reasonable measures to abate it.  *See Farmer*, 511 U.S. at 829, 847; *Greene*, 361 F.3d at 294.  Accordingly, defendant Pratt's motion for summary judgment should be granted.

15

### 8.    CO Kingsley (Count 7)

Plaintiff's allegations against CO Kingsley are limited to Kingsley's actions on the day of the attack, April 26, 2014.  Compl. at PageID.28.  Plaintiff alleged that on that date, CO Kingsley: "(i) Was personally aware that there were threats against Plaintiff's life; (ii) Did not offer to protect Plaintiff; (iii) Did not offer to move Plaintiff; (iv) Abandoned his assigned post; and (v) failed to notify medical or call an ambulance after Plaintiff was attacked."  *Id*.  However, plaintiff has presented no evidence regarding CO Kingsley's actions prior to the attack.  Kingsley's only involvement was reporting that plaintiff had been attacked and arranging to get plaintiff transported to the healthcare department.  *See* discussion in § II.C.2., *infra*.  Accordingly, defendant Kingsley should be granted summary judgment with respect to plaintiff's Eighth Amendment failure to protect claim alleged in this Count.

### 9.    Sgt. Zaborowski (Count 8)

Plaintiff's allegations against Sgt. Zaborowski are limited to her actions on the day of the attack, April 26, 2014.  Compl. at PageID.28. Plaintiff makes the same five allegations against Sgt. Zaborowski in this count as made against CO Kingsley in Count 7.  *Id*.  However, plaintiff has presented no evidence regarding Sgt. Zaborowski's actions prior to the attack.  Her only involvement was responding to CO Kinglsey report, arranging plaintiff's escort to healthcare, and investigating the scene after the fact.  *See* discussion in § II.C.3., *infra*.  Accordingly, defendant Zaborowski should be granted summary judgment with respect to plaintiff's Eighth Amendment failure to protect claim alleged in this Count.

### 10.    CO Bourque (Count 10)

Plaintiff's allegations against CO Bourque are limited to Bourque's actions on the day of the attack, April 26, 2014.  Compl. at PageID.30.  Plaintiff makes the same five allegations against CO Bourque in this count as made against CO Kingsley in Count 7.  *Id.*  However, plaintiff has presented no evidence regarding CO Bourque's actions prior to the attack.  His only involvement was responding to CO Kinglsey report and escorting plaintiff to healthcare after the attack.  *See* discussion in § II.C.3., *infra*.  Accordingly, defendant Bourque should be granted summary judgment with respect to plaintiff's Eighth Amendment failure to protect claim alleged in this Count.

### C.    Plaintiff's claim that the MDOC defendants at MPF were deliberately indifferent to his serious medical needs

### 1.    Plaintiff's Eighth Amendment claim

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).  As discussed, a viable Eighth Amendment claim consists of an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson*, 503 U.S. at 8.  The objective component requires the infliction of serious pain or failure to treat a serious medical condition.  *Id.* at 8-9.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  *Id.* at 9.

17

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Deliberate indifference must involve the "wanton infliction of unnecessary pain." *Rhinehart*, 894 F.3d at 737.  For this reason, the "mere failure to provide adequate medical care to a prisoner will not violate the Eighth Amendment." *Id*.  For this reason, negligence in diagnosing or treating a medical condition does not violate the Eighth Amendment violation. *Farmer*, 511 U.S. at 835.  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 319.

### 2.    CO Kingsley (Count 7)

Plaintiff's relevant claim in this count is that CO Kingsley "(v) failed to notify medical or call an ambulance after Plaintiff was attacked."  Compl. at PageID.28.  Specifically, plaintiff alleged that after the attack, he was bleeding profusely and could not find any staff in his housing unit to assist him.  Compl. at PageID.16.  Plaintiff went to the day room of another housing unit to summon help.  *Id*.  He knocked on a window was able to inform defendant CO Kingsley about what happened and his need for emergency medical attention.  *Id*.  Plaintiff alleged that it would have been obvious to anyone that he needed urgent medical treatment, having suffered severe trauma to his entire head, face and side.  *Id*.  Plaintiff's claim against CO Kingsley is that "Kingsley did not contact the duty nurse or ambulance."  *Id*.

18

According to CO Kingsley, his involvement was limited to placing a radio call for assistance. At 19:46 hours (7:46 p.m.), CO Kingsley heard knocking at one of his windows and saw plaintiff standing there with blood on his face. Kingsley Interrogatory (ECF No. 181-9, PageID.2425).  CO Kingsley immediately called on the radio for assistance and yard staff responded within approximately 10 seconds.  *Id.*  Within another 10 seconds, CO Kingsley observed staff escorting plaintiff to healthcare.  *Id*.

In determining whether a guard is deliberately indifferent to a prisoner or pre-trial detainee's serious medical needs, the Court views the guard's actions as a layperson, not as a medical professional.  "[B]ecause police officers and prison guards are laypersons, not physicians, we must determine if a layperson would easily recognize the necessity for a doctor's attention under the circumstances presented." *Estate of Harbin v. City of Detroit*, 147 Fed. Appx. 566, 571 (6th Cir. 2005) (internal quotation marks, citations and brackets omitted).  The officers must not only be aware of the facts from which they could draw the inference that a prisoner had a serious medical need, they also must draw that inference.  *See id.*, citing *Farmer*, 511 U.S. at 837.  Based on this record, CO Kingsley was not deliberately indifferent.  He recognized that plaintiff had a serious medical condition, reported the situation, and sought assistance to escort plaintiff to healthcare.  Accordingly, CO Kingsley's motion for summary judgment should be granted.

### 3.    Sgt. Zaborowski (Counts 8 and 9), CO Bourque (Counts 10 and 11), and RN Buren (Count 12) failed to give  plaintiff immediate treatment

The gist of plaintiff's deliberate indifference claims against these three defendants is that on April 26, 2014, they failed to provide him with prompt medical attention after the attack.  As discussed, Sgt. Zaborowski and CO Bourque responded to CO Kingsley's call for assistance.

In Counts 8 and 10, plaintiff alleged that defendants Zaborowski and Bourque "(v) failed to notify medical or call an ambulance immediately after Plaintiff was attacked." Compl. at PageID.8 and 30.        In Count 9, plaintiff made five additional claims against defendant Zaborowski, specifically that she: "(i) Chose to interview Plaintiff before he could receive medical attention, in direct violation of MDOC policy; (ii) Made Plaintiff wait more than ten (10) minutes before entering the MPF health care offices; (iii) Refused to contact an ambulance to transport Plaintiff to the hospital, in direct violation of MDOC policy; (iv) Allowed her staff to transport Plaintiff without advanced life support equipment, in direct violation of MDOC policy; and (v) Allowed non-medical staff to transport Plaintiff to the hospital when he was in critical condition, in direct violation of MDOC policy." *Id.* at PageID.29.

In Count 11, plaintiff made three additional claims against defendant Bourque, specifically that he: "(i) Made Plaintiff wait more than ten (10) minutes before entering the MPF health care office, violating MDOC policy; (ii) Chose to interview Plaintiff for more than 60 minutes, preventing medical treatment, violating MDOC policy; (iii) Chose to not offer Plaintiff any medical care, which he obviously needed." *Id.* at PageID.30.

Finally, in Count 12, plaintiff made six claims against defendant RN Buren, alleging that she: "(i) Failed to call an ambulance immediately after the attack; (ii) Failed to provide medical care to Plaintiff for more than fifteen (15) minutes after the attack; (iii) Allowed guards to interview Plaintiff for over sixty (60) minutes, before sending him to the hospital; (v) Did not travel to hospital with guards; and (vi) Did not stabilize Plaintiff before sending him to the Munson hospital." *Id*. at PageID.31.

20

In support of these claims, plaintiff alleged the following facts.  Sgt. Zaborowski and CO Bourque instructed him to walk to the control center which was "hundreds of feet away," and that "[p]laintiff was not offered a stretcher or wheelchair to assist him in getting to the control center."  Compl. at PageID.16.  Because plaintiff was bleeding, CO Bourque instructed him "to wait on a bench outside medical for approximately ten (10) minutes, without medical attention."  *Id.*  Plaintiff was allowed to enter healthcare, "but was then interviewed by custody staff, including Defendant Sgt. Zaborowski, for approximately ninety (90) minutes."  *Id.* at PageID.17.  Then, RN Buren violated MDOC policy because she did not offer him "any proper or professional medical attention" during his 90 minute interrogation, and that it was only after plaintiff's "inquisition" that RN Buren conducted a preliminary medical examination.  *Id.* at PageID.16-17.  When two corrections officers (Hansen and Sobeck) asked whether they needed to summon an ambulance to transport plaintiff to the hospital, RN Buren "indicated that there was no time to wait for EMS, in violation of MDOC policy, due to severe trauma."  *Id.*  RN Buren did not accompany plaintiff to the hospital.  *Id.*

In her interrogatory responses, Sgt. Zaborowski stated that at approximately 19:46, CO Kingsley called for yard assistance in 4 Block and that when she arrived in the 4 Block entrance by the prisoner phones, she saw plaintiff walking towards her with a gaping cut between his eyebrows and holding a towel.  Zaborowski Interrogatory (ECF No. 181-10, PageID.2431-2432).  She immediately sat him down in a chair, briefly spoke to him, and instructed CO Bourque to escort plaintiff through 4 Block's TV room and up to healthcare.  *Id.* at PageID.2432.  Sgt. Zaborowski took the control center camera and took pictures of the area where the assault took place.  *Id.*

21

In his interrogatory response, CO Bourque stated that he responded to a radio call for assistance in 4 Block.  Bourque Interrogatory (ECF No. 181-11, PageID.2438).  Upon entering the building, Bourque saw plaintiff sitting by the prisoner phones bleeding from his head.  *Id*.  Sgt. Zaborowski ordered Bourque to take plaintiff to healthcare.  *Id*.  Bourque asked plaintiff "if he could walk or did he need a wheelchair."  *Id*.  Plaintiff did not answer, but stood up and walked to the administration building.  *Id*. at PageID.2438-2439.  After entering that building, Bourque told plaintiff to sit on the bench outside of healthcare.  *Id*. at PageID.2438-2439.  When healthcare staff called plaintiff, Bourque escorted him inside and then reported to the bubble area. *Id*. at PageID.2438-2439.  Bourque did not recall being present for an interview.  *Id*. at PageID.2439.

RN Buren set forth the following facts in her affidavit.  Plaintiff was escorted to Healthcare during the evening hours of April 26, 2014, while medications were being distributed. Buren Aff. (ECF No. 187-1, PageID.3186).    She shut down the "med line" in order to attend to plaintiff.  *Id*.  At that time, plaintiff was bleeding from the nose as well as from several lacerations to his head.  *Id*.  RN Buren cleaned those areas and applied pressure to stop the bleeding.  *Id*. Plaintiff was alert and orientated through the assessment and treatment, and no "life-threatening processes" occurred while RN Buren attended to him.  *Id*.  RN Buren called the on-call Medical Provider who ordered that plaintiff be sent to the emergency room via an MDOC vehicle.  *Id*.  In response to plaintiff's allegation that RN Buren was deliberately indifferent for failing to call an ambulance, Buren responded that "as an RN, I do not have the authority to change or override the orders issued by the Medical Provider."  *Id*. at PageID.3187.

RN Buren's critical incident report, which plaintiff attached to the complaint in support of his claim, sets forth a similar series on events.  In this report, RN Buren stated that

22

plaintiff was escorted by custody to medical during the evening medlines and that the medlines stopped.  Critical Incident Participant Report (ECF No. 1-1, PageID.60).  RN Buren noted that plaintiff was bleeding from the nose with the following other injuries: three 1 inch lacerations to the head; a 2cm x 2cm x 0.5 cm laceration to the upper bridge of nose near the right eye; and 9 puncture wounds to the back right lower quadrant.  *Id*.  The areas were cleaned, pressure applied to sop bleeding, and the on call doctor was contacted for an order to send plaintiff to the emergency room for further assessment and treatment.  *Id*.

MPF medical records reflect that plaintiff was admitted for an unscheduled nurse visit at 8:05 p.m., and that RN Buren had completed examination and treatment by 8:51 p.m., when she logged in her notes.  Medical Records (ECF No. 185, PageID.2565-2567). Munson Medical Center records reflect that plaintiff underwent triage at the hospital at 21:02 (9:02 p.m.), places plaintiff as being inside the hospital about 76 minutes (or 1 hour and 16 minutes) after the incident was reported by CO Kingsley.  *Id.* (ECF No. 185-1, PageID.2972).

Based on this record, plaintiff has failed to establish that defendants were deliberately indifferent to his serious medical needs.  It is undisputed that Sgt. Zaborowski ordered plaintiff to be transported to healthcare and that CO Bourque transported plaintiff as ordered.  While plaintiff complains that he was not offered a stretcher or wheelchair, he does not allege facts that he requested either of these devices or that he was unable to walk.  Plaintiff's claim that RN Buren withheld medical treatment while Sgt. Zaborowski and CO Bourque interrogated him for about 90 minutes is flatly contradicted by the medical record.  Plaintiff was being treated at Munson Medical Center in Traverse City, Michigan, at 9:02 p.m., or about 76 minutes after CO Kingsley reported the incident.  The Court takes judicial notice that MPF is located in Kingsley, Michigan, and is more

23

than 20 miles from Munson Medical Center which is located in Traverse City, Michigan.[4]  Given this timeline, there is absolutely no evidence that plaintiff was interrogated for "about 90 minutes" before his initial treatment from RN Buren.

Finally, plaintiff's claim that RN Buren was deliberately indifferent for transporting him to the Munson Medical Center via an MDOC vehicle rather than an ambulance is without merit. It is undisputed that RN Buren contacted the medical provider for instructions on how to proceed and that the medical provider instructed her to transport plaintiff directly to the hospital.  There is no evidence to support plaintiff's claim that RN Buren was deliberately indifferent for following the medical provider's instruction to use MDOC transport rather an ambulance. *See generally, Braddock v. Crompton*, No. 1:10-cv-731, 2015 WL 6040307 at *3 (W.D. Mich. Oct. 15, 2015) (nurse lacked subjective component of deliberate indifference claim where she had no authority to reinstate requested drug); *Villa v. Rowe*, 2009 WL 4823019 at *6 (N.D. Cal. Dec.10, 2009) (nurses were not deliberately indifferent where "they did not have the power to prescribe new medication for plaintiff or to go against the doctors' orders prescribing such medication").

In summary, plaintiff has failed to establish that Sgt. Zaborowski, CO Bourque, or RN Buren were deliberately indifferent to his serious medical needs.  Accordingly, their motions for summary judgment should be granted.

### 4.    CO Hansen (Count 13) and CO Sobeck (Count 14)

In Counts 13 and 14, plaintiff alleged that on April 26, 2014, CO Hansen and CO Sobeck were deliberately indifferent to his serious medical needs because they: "(i) Did not call an

---

[4] The Court notes that an internet map search using Google Maps indicates that the distance between MPF and the Munson Medical Center Emergency Room is approximately 27 miles.

ambulance to transport Plaintiff to the hospital, per MDOC policy; (ii) Did transport Plaintiff to the hospital without medical personal [sic], in violation of MDOC policy; (iii) Did transport Plaintiff to the hospital without any advance life support equipment; and (iv) Allowed for a ninety (90) minute delay in transporting Plaintiff to the hospital after his assault."  Compl. at PageID.31-32.

Plaintiff made two factual statements in support of these claims.  First, plaintiff alleged that CO Hansen and CO Sobeck placed him in chained restraints, walked him to the back of a state sedan, and drove him to the hospital "without any sense of urgency."  Compl. at PageID.17.  Second, plaintiff alleged that Hansen and Sobeck "did not bring any advanced life support equipment or trained medical personnel" while transporting him to the hospital. *Id*.

In responding to plaintiff's interrogatory as to why CO Sobeck though it was appropriate to use a car to transport plaintiff to the hospital, CO Sobeck stated, "Transportation needs to a hospital is a Healthcare decision; I received a call from a supervisor stating that I was to take a prisoner to Munson Medical Center and instructed to take a state vehicle."  Sobeck Interrogatory (ECF No. 181-13, pageID.2445).  When asked to explain what happened upon arrival at the hospital, Sobeck stated:

> Like all inmates that were transported by me with a state vehicle to Munson Medical Center, we were taken to the triage room and then given a room in the emergency wing of the Medical Center.  It was no different than any other time we were transporting a prisoner with a state vehicle.

*Id*. at PageID.2446.

For his part, CO Hansen provided a detailed response to plaintiff's interrogatory asking for a "time-line of events related to the transportation of Plaintiff to the hospital on April 26, 2014":

As I recall, on April 26, 2014, I was working in Housing Unite 1 C-D.  At approximately 2000 hours [approximately 14 minutes after the attack was reported], Sgt. Johnson contacted me to facilitate a transportation run to Munson Medical Center.  I reported to the control center area and pulled restraints for the transport. I then reported to healthcare and applied the restraints to prisoner Coonrod.

Upon arrival at Munson Medical Center, we received a wheel chair to escort the prisoner into the emergency room.  Then we escorted the prisoner to a triage room.  Following the diagnosis of his injuries, we escorted the prisoner to a room inside the emergency center.  The prisoner then sat on a bed until seen by Healthcare professionals.  We escorted the inmate to a CT scan machine.  After the scan, we went back to the room and waited to hear from Healthcare professionals about treatment.

I remained with the prisoner until relieved by another MPF Officer.

Hansen Interrogatories (ECF No. 18-14, PageID.2451-2452).

Plaintiff's has failed to present any evidence that CO Sobeck and CO Hansen were deliberately indifferent to his serious medical needs.  It is undisputed that CO Sobeck and CO Hansen transported plaintiff directly from MPF to the Munson Medical Center emergency room as instructed.  They used a wheel chair to escort plaintiff into the emergency room, escorted him to the triage room, and escorted him to get a CT scan. While plaintiff complains that there was a lack of life support equipment or medically trained personnel in the vehicle, there is no evidence that he was in a life threatening situation or that he suffered any injury for lack of these.  Accordingly, CO Sobeck and CO Hansen's motions for summary judgment should be granted.

### D.    Plaintiff's claim that the MDOC defendants at DWH were deliberately indifferent to his serious medical needs

### 1.    RN Dunning-Meyers (Count 18)

In Count 18, plaintiff alleged that RN Dunning-Meyers, "a supervisor of the M.D.O.C.'s Duane Waters Hospital,"  was deliberately indifferent to his serious medical needs because she: "(i) Delayed medical treatments for Plaintiff; (ii) Denied Plaintiff treatments prescribed

by specialist doctors; (iii) Refused to refer Plaintiff to specialist for more than eight (8) days after his arrival at her facility; (iv) Refused to give Plaintiff his eye pressure pills for more than 3 days, against the specialist doctors [sic] orders; (v) Failed to forward Plaintiff's complaints to treating physicians; (vi) Failed to follow the standard of care set by the A.M.A.; (vii) Refused to follow-up with Plaintiff for his much needed surgeries."  Compl. at PageID.34-35.

Plaintiff set forth the following facts in support of this claim.  The staff at the Munson Medical Center determined that "his condition was stable, but he needed surgery ASAP on nose and needed an eye doctor to examine his eye within 12 days."  Compl. at PageID.18.  However "[g]oing against the medical advise of Munson Hospital staff," plaintiff was transferred from Munson Medical Center to the MDOC's DWH.  *Id*. at PageID.18-19.  When plaintiff arrived at DWH, he was admitted through the emergency department and housed in a single room on the fourth floor "under the direct care of Defendant nurse Dunning Myers [sic], and his treating physicians were Defendants Doctor Tan, Pandya and Bomber."  *Id*. at PageID.19.  According to plaintiff, he was only given an IV with saline solution and antibiotics and after two days received pain medicines "but not the ones prescribed by his treating physician at Munson."  *Id*.   In addition, for the first ten days at DWH, plaintiff "had not been examined, evaluated or treated by any physician at DWH", having only received treatment from the floor nurses.  *Id*. at PageID.20.

Plaintiff's verified complaint does not contain any facts to explain how defendant RN Dunning-Meyers acted with deliberate indifference to his serious medical needs.  Plaintiff simply alleged that he was under her "direct care".  At most, plaintiff makes general statements that RN Dunning-Meyers only provided him an IV solution, antibiotics and pain medication.   In her interrogatory response to plaintiff's request regarding her understanding of his treatment plan, RN

Dunning-Meyers stated, "As a registered nurse, I am not involved in the formation of treatment plans nor do I prescribe medication." Dunning-Meyers Interrogatories (ECF No. 181-15, PageID.2457). Plaintiff has provided no evidence that defendant Dunning-Meyers engaged in any conduct which violated his Eighth Amendment rights in her capacity as a registered nurse. Furthermore, as discussed, *infra*, plaintiff's allegation that "had not been examined, evaluated or treated by any physician at DWH" during his first ten days at that hospital is contradicted by the medical record. Accordingly, defendant RN Dunning-Meyers' motion for summary judgment should be granted.

### 2. Dr. Borgerding (Count 20)

In Count 20, plaintiff alleged that Dr. Borgerding was deliberately indifferent to his serious medical needs during his stay at DWH because the doctor: "(i) Failed to provide prescribed treatments to Plaintiff; (ii) Delayed medical treatments to Plaintiff; (iii) Failed to insure Plaintiff received his mandatory surgeries; (iv) Failed to follow-up with Plaintiff; and (v) Failed to adhere to the established standard(s) of care." Compl. at PageID.35-36.

Plaintiff alleged that while he received two eye surgeries, a scheduled or recommended third eye surgery did not take place. Compl. at PageID.21. Plaintiff's only factual allegation involving Dr. Borgerding is that he failed to approve this third surgery, i.e., "Defendants Doctors Bogerding and Whiteman have refused to give Plaintiff the balance of the surgeries that are part of his treatment plan, as prescribed and established by U of M specialists." *Id*. at PageID.22. However, defendants point out that plaintiff may not proceed on this claim against Dr. Borgerding because the claim was dismissed for lack of proper exhaustion. *See* Order Adopting R&R (ECF No. 49, PageID.292) ("Coonrod's claim relating to the failure to authorize a third eye surgery, as

referenced in the grievance (PageID.176) is dismissed, without prejudice, for failure to exhaust.").

Because plaintiff's only claim against Dr. Borgerding is unexhausted, the doctor's motion for

summary judgment should be granted.

### E.   Plaintiff's claims that the Corizon doctors were deliberately indifferent to his serious medical needs

### 1.   Plaintiff's claims against Dr. Bomber, Dr. Whiteman, and Dr. Tan

Plaintiff's claims against the Corizon doctors, Dr. Tan, Dr. Bomber, and Dr.

Whiteman, involve alleged constitutional violations which occurred while plaintiff was an inpatient

at DWH.   In Counts 21 and 23, directed against defendants Dr. Bomber and Dr. Whiteman,

respectively, plaintiff alleged five reasons why these two doctors were deliberately indifferent to his

serious medical needs: "(i) Failed to provide prescribed treatments to Plaintiff; (ii) Delayed medical

treatments to Plaintiff; (iii) Failed to insure Plaintiff received his mandatory surgeries; (iv) Failed

to follow-up with Plaintiff; and (v) Failed to adhere to the established standard(s) of care."  Compl.

at PageID.36-37.

In Count 19, plaintiff set forth the following reasons why Dr. Tan, his treating

physician, was deliberately indifferent to his serious medical needs: "(i) Did not meet the standards

of care; (ii) Delayed prescribed treatments for Plaintiff; (iii) Denied prescribed treatments for

Plaintiff' (iv) Failed to properly treat Plaintiff for more than eight (8) days after arriving at DWH;

(v) Failed to follow-up with Plaintiff's specialists; (vi) Failed to ensure Plaintiff received all of his

mandatory surgeries."  *Id*. at PageID.35.

During plaintiff's deposition, he refined his claims against the doctors to two issues:

(1) that he was not provided surgery for facial fractures during his first 10 days at DWH as required

29

by the "treatment plan" developed at the Munson Medical Center; and, (2) that he was not seen by an eye specialist during his first 10 days at DWH as required by the Munson Medical Center's treatment plan.

### 2.    Dr. Bomber (Count 21) and Dr. Whiteman (Count 23)

Neither Dr. Bomber nor Dr. Whiteman treated plaintiff at DHW.  At his deposition, plaintiff did not identify any specific claims against Dr. Bomber.  In response to a question asking what Dr. Bomber "did or did not do that was deliberately indifferent to your medical needs," plaintiff gave non-specific testimony:

> He failed to provide the prescribed treatments, delayed medical treatments, failed to ensure that I received my mandatory surgeries, failed to follow up, and failed to adhere to the established standards of care.

Coonrod Dep. (ECF No. 183-5, PageID.2552).  When asked to identify the surgeries, plaintiff responded, "My face, my broken nose, the twelve fractures in my eye, the broken sinus … and for the first ten days my eye itself." *Id.* at PageID.2554.  Plaintiff did not recall any personal interaction with Dr. Bomber and that his claims against the doctor were based upon his review of the medical records. *Id.* at PageID.2553.  When asked what facts regarding Dr. Bomber's involvement with his claim regarding surgery or seeing an eye specialist, plaintiff responded, "He was a supervising medical doctor and he would have known of all the surgeries that I needed." *Id.*

Plaintiff identified similar conclusory claims against Dr. Whiteman, testifying that Dr. Whiteman was deliberately indifferent because the doctor failed to provide prescribed treatments, delayed treatments and failed to ensure that he received surgeries for his nose, fractures and broken sinuses. *Id.* at PageID.2555.  As with Dr. Bomber, plaintiff admitted he did not recall

30

having any direct communication with Dr. Whiteman and that his allegations against the doctor were based on his review of the medical records. *Id*. at PageID.2556.

In their declarations, both Dr. Bomber and Dr. Whiteman stated that they were not involved in any aspect of plaintiff's care. Bomber Decl. (ECF No. 183-3, PageID.2535); Dr. Whiteman Decl. (ECF No. 183-4, PageID.2540). Dr. Bomber stated that he is a doctor of osteopathy, was the Regional Medical Director for Corizon beginning in January 2011, and the State Medical Director of Corizon since July 2015. Bomber Decl. at PageID.2534. Dr. Whiteman stated that he is a medical doctor, and served as the Senior Site Physician at DWH when plaintiff was a patient at the hospital (April 28, 2014 through July 14, 2014). Whiteman Decl. at PageID.2539. In this position, Dr. Whiteman supervised the other medical providers. *Id*.

Plaintiff claims against Dr. Bomber and Dr. Whiteman are based solely on their roles as supervisors of other medical providers. However, plaintiff's claims fail because supervisors such as Dr. Bomber and Dr. Whiteman "cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotation marks omitted). There is no evidence that either Dr.

Bomber or Dr. Whiteman directly participated in plaintiff's treatment at DWH.[5]  Accordingly, Dr. Bomber and Dr. Whiteman's motions for summary judgment should be granted.

### 3.    Dr. Tan

To the extent plaintiff has a deliberate indifference claim against defendant physician, that claim would be against Dr. Tan, the physician who coordinated his treatment at DWH.  In this regard, plaintiff testified that Dr. Tan "didn't prescribe the treatments for me from Munson." Coonrod Dep. (ECF No. 183-5, PageID.2549).  When asked to elaborate on what treatment was not prescribed, plaintiff responded:

> A. The surgeries, the eye surgeries.
>
> Q. What eye surgeries are you talking about?
>
> A. The bones around my face, my nose being broke. He did not send me to any specialists on those.
>
> Q. For your bones in your face?
>
> A. Yes.

*Id*. at PageID.2549-2550.  When asked for the factual basis for any other claims he sought to pursue against Dr. Tan, plaintiff responded:

> A. Upon my arrival at Duane Waters for the first ten days he did not refer me to any eye specialists. He apparently failed to follow-up with the specialist at Munson. He just failed to provide proper medical care.
>
> Q. So is there anything else that you contend with respect to Dr. Tan?
>
> A. No.

---

[5] Even if plaintiff had shown direct participation by Drs. Bomber and Whiteman, his claim would still fail because there is no evidence that Dr. Tan violated plaintiff's Eighth Amendment rights.  *See* discussion, *infra*.

*Id.* at PageID.2550.

Plaintiff testified that when he was transferred to DHW "I sat in that room for ten days with nothing." *Id.* at PageID.2548.  Plaintiff continued:

> The treatment plan at Munson Hospital was to get the swelling down, get me my eye surgery immediately due to fractures. My nose was broke, my sinus was broke, the twelve fractures here in my eye socket was done, and what they did . . . they were going to do all of this within 12 days. That was their plan. That's exactly what it says in their 12-day plan. I sat at Duane Waters Hospital for 10 days with a drip, and I can't even recall if I got medication or not.

*Id.*

As an initial matter, the Court will address the Munson Medical Center "treatment plan" which lies at the heart of plaintiff's deliberate indifference claim.  In his complaint, plaintiff alleged that "Munson hospital staff contacted their plastic surgeon to schedule him for emergency re-constructive surgery for April 27, 2014."  Compl. at PageID.17.   Contrary to plaintiff's allegation, there is no record of emergency reconstructive surgery scheduled on that date.

Plaintiff's medical records reflect that Dr. Petra C. von Kulajta, an ophthalmologist, was unable to do a complete examination on April 26, 2014, due to swelling.  Compl. Exh. (ECF No. 1-2, PageID.87).  Dr. Kulajta's diagnoses and plan indicated that plaintiff had "[p]eriorbital swelling with intact globe," that she found "no evidence of globe rupture", and recommended "that he be reexamined once the swelling has decreased to further inspect the globe." *Id.*

On April 27, 2014, plastic surgeon Christopher C. Jeffries, M.D. evaluated plaintiff at Munson Medical Center, observed that plaintiff had multiple right-sided facial fractures, and offered the following opinion:

> Mr. Coonrod has significant fractures of the right nasal bone and medial orbital wall as well as right infraorbital rim due to direct trauma from his assailants. As well, the septum appears paradoxically shifted to the right side, but significantly

33

fractures. I would recommend an operative fixation of all of the above via a combination of approaches, including re-opening his laceration on the right nasal/supraorbital rim, an intraoral approach as well as an eyelid incision. The benefits would be restoration of appearance and avoidance of any diplopia or other complications relative to orbital dystopia. Also restoration of functional airway. His right eye swelling does not permit an adequate exam at this time to confirm findings on the CT scan, and he should be followed through resolution of his swelling for this purpose. He is being seen by ophthalmology as well. However, I suspect that their exam will be likewise limited. He should have his globe cleared prior to any surgical intervention on my part. Finally, based on his social circumstances and incarceration at Pugsley Correctional Facility, I would be willing to offer him care. However, arrangements for care of their prisoners have been completely unsatisfactory on an outpatient basis and actually lead to no care being provided. Therefore, for the sake of this patient, I would recommend an inpatient stay until his swelling resolves, permitting operative fixation as described above, conservatively estimated to be with in 1 week.

Dr. Jeffries Report (ECF No. 1-2, PageID.86).

Plaintiff alleged that "[u]pon learning of the MDOC's intentions to transfer Plaintiff, Munson staff advised MDOC custody and healthcare staff to not transfer him, as his condition was stable, but needed surgery ASAP on nose and needed eye doctor to examine his eye within 12 days," but that the MDOC went "against the advise [sic] of the Munson Hospital staff" and transferred him to DWH. *Id.* at PageID.18. Plaintiff points to no further evidence on this issue. While Dr. Jeffries expressed a strong preference that plaintiff remain inpatient at the hospital and not be transferred to MPF, *see* PageID.86, plaintiff was not transferred to MPF. Rather, plaintiff was transferred to DWH where he remained an inpatient for some months.

The treatment plan upon which plaintiff apparently relies upon appears on page 2 of a progress record from Elizabeth C. Erickson, PA (April 27, 2014) which included as part of plaintiff's "Plan": "Dr. Jeffries recommends surgical fixation in 10-14 days, to allow edema to subside"; "ice"; "would like patient to stay in house during this period to ensure patient gets surgical care, as most Pugsley patients do not return for surgery;" and "Optho - attempted to see this

morning, will return for further exam after edema subsides". Compl. Exh. 1-2, PageID.91; Progress

Note (ECF No. 185-1, PageID.2981-2982). Based on the complaint and this record, it appears that

plaintiff's claim is that defendants failed to follow Dr. Jeffries' recommendation for "surgical

fixation in 10-14 days, to allow edema to subside."

The Corizon defendants filed over 600 pages of medical records of plaintiff's medical

treatment in support of their motion, which they summarized in their brief. For purposes of this

report, the Court will quote defendants' summary of the medical treatment provided during the 21

days after his release from Munson Hospital (i.e., from April 28, 2014 to May 19, 2014). This

summary is consistent with plaintiff's medical records for those dates and is set forth below:

> On April 28, 2014, Plaintiff was transferred to DWH from Munson where he had been taken on April 26, 2014, after being assaulted at Pugsley Correctional Facility. [Tan Dec. ¶ 5, MR 973-74]. Plaintiff was a patient at DWH from April 28, 2014, until July 24, 2014 ("applicable period"). [Tan Dec. ¶ 4, MR 69-70, 372-73].

> Upon arrival at DWH, Plaintiff was seen in the emergency room by PA Richard Evans who noted Plaintiff had received a "work-up" at Munson where a CT scan revealed multiple facial fractures, including to the nasal bone, orbit, orbital floors, and zygomatic arch. [Tan Dec. ¶ 9, MR 69-70]. The following morning, April 29, 2014, Plaintiff was seen by Dr. Rashed Bashir. [Tan Dec. ¶ 11, MR 79-80, 82-3]. Dr. Bashir noted Plaintiff had been treated at Munson following an assault, which resulted in right orbital and facial fractures. Dr. Bashir noted surgery for these conditions had been deferred due to increased swelling. Dr. Bashir noted Plaintiff was unable to open his right eye due to swelling. Plaintiff reported the eye doctor at Munson said his eye was okay. Dr. Bashir noted Plaintiff's pain control was adequate. Dr. Bashir noted Plaintiff would be referred to a dentist and a maxillofacial surgeon for evaluation for plastic surgery related to the right orbital and facial bone fractures. [Id.].

> Plaintiff was seen by Dr. Bashir the following day, April 30, 2014. [Tan Dec. ¶ 12, MR 90-1]. Medical records from Munson were received on April 29, 2014, but after Dr. Bashir's visit with Plaintiff earlier that day. [Id., MR 973-82]. Dr. Bashir noted in Plaintiff's medical record significant information contained in the Munson discharge summary, which included the CT findings related to Plaintiff's facial fractures and that examination of Plaintiff's right eye had been limited due to swelling and bruising. Dr. Bashir noted the bruising and swelling of the right eyelid

had decreased but Plaintiff was still unable to open his eye. Dr. Bashir noted his previous referrals and that dental was waiting to see the CT scans from Munson before evaluation. [Tan Dec. ¶ 12, MR 90-1]. Dr. Bashir continued Norco for pain and added a prescription for MS Contin through May 7, 2014. [*Id.*, MR 92].

On May 1, 2014, a member of the nursing staff noted Plaintiff had completed the prescribed course of the antibiotic Cefazolin without complications and he had no complaints concerning his treatment. [Tan Dec. ¶ 13, MR 98]. She noted the swelling around the right eye had reduced slightly but it was tender to the touch and he could not open it. Plaintiff complained of only mild, intermittent headaches. [*Id.*].

Dr. Tan saw Plaintiff on May 2, 2014. [Tan Dec. ¶ 15, MR 108]. Dr. Tan ordered that Plaintiff's vital signs be checked daily and for him to be seen at the DWH Eye Clinic as soon as possible. On May 2, 2014, Dr. Tan was aware steps had been initiated for Plaintiff to be seen for a surgical consultation regarding the repair of his facial fractures once the swelling decreased sufficiently. This had been the focus of Dr. Bashir's efforts. However, the medical records also reflected the examination performed by the ophthalmologist at Munson had been limited due to swelling and bruising. Dr. Bashir's notes and the nursing progress notes did not reflect any current complaints or evidence of intraocular eye damage. However, Plaintiff had not been able to open his right eye, which limited his ability to report a problem. Since the current information on Plaintiff's right eye was limited due to the previous inability to conduct a complete examination, Dr. Tan wanted Plaintiff's right eye to be evaluated by a specialist as soon as the swelling decreased sufficiently to permit a complete examination. By May 2, 2014, the swelling had decreased somewhat and Dr. Tan expected it to continue to decrease. Therefore, he ordered an evaluation be conducted at the DWH eye clinic. He ordered this to be performed as soon as possible so it would not be treated for scheduling purposes as a routine request. Although there was no current evidence of any intraocular problems, Dr. Tan did not want this evaluation to be delayed unnecessarily in case there was a problem that needed attention. [*Id.*].

On May 2, 2014, pursuant to Dr. Bashir's referral, Harry Williams, DDS, submitted a utilization management request for Plaintiff to be scheduled to be seen by Dr. Cardon in the DWH clinic for an oral surgical evaluation. [Tan Dec. ¶ 14, MR 104-5]. Dr. Williams requested this be scheduled after Dr. Cardon reviewed Plaintiff's CT scans. [*Id.*].

On May 6, 2014, Plaintiff was seen by Dr. Orson Cardon for an oral surgery consult. [Tan Dec. ¶ 16, MR 812]. Dr. Cardon discussed with Plaintiff the risks and benefits of surgery. Plaintiff reported visual impairment of the right eye and Dr. Cardon recommended an ophthalmology consult. He also noted Plaintiff might benefit from an ENT consult after he was cleared by ophthalmology. [*Id.*].

36

Following his visit with Dr. Cardon on May 6, 2014, Plaintiff was seen later that day at the DWH eye clinic by Dr. Glen Linsley. [Tan Dec. ¶ 17, MR 819]. Plaintiff reported being unable to open his right eye and darkness of vision. He reported being hit with a lock in a sock and having a "blowout" fracture. Plaintiff reported having previous procedures for cataracts with the placement of intraocular lenses in both eyes (pseudophakia). Dr. Linsley examined Plaintiff and noted the following conditions: 1) iridodialysis (separation of the iris from its attachment to the ciliary body); 2) iritis (inflammation of the iris); 3) blow-out fracture; 4) pseudophakia; 5) vitreous hemorrhage; 6) levator paresis (drooping eyelid); 7) extraocular movement involvement, and 8) periorbital lacerations. [Id.]. These conditions involved the right eye, except pseudophakia, which involved both eyes. On May 6, 2014, Dr. Linsley filled out an urgent utilization management request for Plaintiff to be seen at the University of Michigan Kellogg Eye Clinic. (MR 825).

On the morning of May 9, 2014, Dr. Tan saw Plaintiff. [Tan Dec. ¶ 9, MR 117-118]. Dr. Tan noted Plaintiff had been seen at the DWH eye clinic on May 6, 2014, and received six diagnoses. Dr. Tan noted an urgent referral to Kellogg Eye Clinic at the University of Michigan (Kellogg) was pending. He noted Plaintiff's facial lacerations were well healed without signs of infection. Dr. Tan ordered removal of the sutures and staples [MR 119], which was done that day. [MR 125].

On the afternoon of May 9, 2014, Plaintiff was seen by Dr. Neil Farbman, an ophthalmologist, at the emergency department of the University of Michigan. [Tan Dec. ¶ 20, MR 828-30, 838-41]. Plaintiff reported right eye pain (2 on a scale of 10) which was not increased with extraocular movements. He reported a drooping right eyelid, very poor vision (can see some colors, outlines, and shadows, but cannot recognize specific objects). Plaintiff's visual acuity was noted to be finger counting at one foot in the right eye and 20/30 in the left eye. Dr. Farbman's impressions were as follows: 1) iridodialysis; 2) zonular dehiscence (disruption of the zonular fibers that support the lens) with a mildly dislocated PCIOL (post-cataract intraocular lens); 3) hyphema (pooling of blood in the anterior chamber); 4) likely vitreous hemorrhage; 5) traumatic ptosis with poor levator function); 6) right medial brow laceration, well sutured; and 7) orbital floor and medial wall fracture with hypo globus (downward displacement of the eye in the orbit) and minimal enophthalmos (posterior displacement of the eye) with no restriction of extraocular mobility. Dr. Farbman recommended Pred Forte, Atropine, bedrest, sleep with head elevated, and wear a shield over the eye. He also recommended no aspirin-containing products or NSAIDs and to avoid nose blowing. He noted arrangements would be made for follow up in the glaucoma and oculoplastic clinics in one to two weeks. [Id.].

Upon his return to DWH, Plaintiff was seen by Dr. Michael Adix. [Tan Dec. ¶ 21, MR 127]. He was seen around 1:00 a.m. on May 10, 2014. Dr. Adix issued orders for Norco, Atropine, and Pred Forte. [MR 128]. Later in the morning of May 10, 2014, Plaintiff was seen by Dr. Muhammad Rais. [Tan Dec. ¶ 22, MR 133-35].

37

Dr. Rais noted Plaintiff's recent history, that he was to be seen for follow-up at Kellogg, and confirmed Dr. Adix's orders. [*Id.*].

Dr. Tan saw Plaintiff on May 14, 2014, and noted Plaintiff's history, current diagnoses, and that he was scheduled to be seen at Kellogg on May 27, 2014. [Id.]. [Tan Dec. ¶ 23, MR 146-7]. Dr. Tan saw Plaintiff again on May 19, 2014. [Tan Dec. ¶ 24, MR 160-61]. He issued orders for Plaintiff to be seen at the DWH Eye Clinic for follow up and to assist with the submission of a UM request for Plaintiff to be seen at Kellogg. [MR 159].

Corizon Defendants' Brief (ECF No. 183, PageID.2480-2484) (emphasis and footnote omitted).

Before evaluating the merits of plaintiff's claim that defendants failed to follow the Munson Medical Center treatment plan, the Court makes the initial observation that a prison doctor is not deliberately indifferent to a prisoner's serious medical needs solely because she does not follow a private physician's recommended course of treatment.  *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir.1977) (where a prisoner's private physician recommended a course of treatment for the plaintiff's condition, a prison doctor's use of a different treatment regimen did not amount to deliberate indifference for purposes of an Eighth Amendment claim). As this Court has often stated, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."  *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted).  Accordingly, plaintiff does not prevail on his deliberate indifference claim against Dr. Tan simply because Dr. Tan did not follow a treatment plan developed by a private physician such as Dr. Jeffries.

Even if the Court assumes that Dr. Tan rejected Dr. Jeffries' recommendations, plaintiff has failed to establish that Dr. Tan acted with deliberate indifference to his serious medical needs. Plaintiff's medical records reflect that after his release from Munson Medical Center, Dr. Tan and other medical staff at DWH monitored plaintiff's condition and sought outside referrals to treat his condition.   Contrary to plaintiff's claim that he was ignored, the records reflect that he was evaluated and treated by at least eight medical providers during his first 10 days at DWH:  PA Evans; Dr. Bashir; Dr. Tan; Dr. Cardon (oral surgery consult); Dr. Linsley (optometrist); Dr. Farbman (ophthalmologist at University of Michigan); Dr. Addix; and, Dr. Rais.  Two of these providers, Dr. Linsley and Dr. Farbman, were eye specialists. Dr. Tan recognized that plaintiff did not have a full eye examination at Munson Medical Center and referred him to be seen at the DWH Eye Clinic as soon as possible.  After Dr. Linsley diagnosed plaintiff with multiple intraocular conditions, he made an urgent referral to the Kellogg Eye Clinic where plaintiff's care was managed by eye specialists.

Finally, to the extent plaintiff alleged that Dr. Tan violated his constitutional rights by delaying his treatment beyond the 12-day "treatment plan," this claim fails.  When an inmate complains about a delay in medical treatment in an Eighth Amendment situation, the inmate must have corroborative medical evidence in the record to demonstrate the detrimental effect of the delay in medical treatment.  *See Napier v. Madison County, Ky.*, 238 F.3d 739, 742-43 (6th Cir. 2001) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed") (internal quotation marks omitted).  Plaintiff has not presented any such corroborative medical evidence.  Dr. Linsley examined plaintiff's eye on May 6, 2014 (eight

39

days after his transfer to DWH) and plaintiff was seen by an ophthalmologist at the University of Michigan's Kellogg Eye Clinic (Dr. Farbman) on May 9, 2014 (11 days after his transfer to DWH). At that time, Dr. Farbman initiated a course of treatment for plaintiff's eye, made no recommendation for surgery, and scheduled plaintiff for a follow-up. At his follow-up appointment on May 27, 2014, the ophthalmologist (Dr. Hakan Demirci) deferred surgical intervention on plaintiff "until his iridodialysis and elevated intraocular pressure have been addressed by the glaucoma service." Medical Records (ECF No. 185-2, PageID.3023). On July 14, 2014, Dr. Tan requested approval for plaintiff to receive eye surgery for unresolved eye pressure which was performed on July 15, 2014. A second eye surgery was performed on August 7, 2014, for a vitrectomy, intraocular lens exchange, iris repair, and repositioning of a tube that had been placed in the earlier procedure. Dr. Tan Aff. (ECF No. 183-1, PageID.2520-2522).

Plaintiff was being treated continuously over a period of four months to resolve his eye injuries. While Dr. Jeffries initially wanted to perform plastic surgery within 10 to 14 days after his April 27, 2014 consultation, the proposed surgical repair was contingent on the resolution of the swelling of plaintiff's eye to allow an examination by an ophthalmologist and the repair of the orbit. However, due to plaintiff's medical condition, the surgeons could not perform the initial eye surgery until July 2014. Plaintiff has presented no evidence that he could have even had the reconstructive surgery to his face before his eye problem was resolved. For these reasons, Dr. Tan's motion for summary judgment should be granted.

### 3.    Corizon

Finally, plaintiff alleged that defendant Corizon was deliberately indifferent for delaying prescribed treatments, denying prescribed treatments, "making medical decisions based on

non-medical factors," providing inadequate medical treatment, interfering with prescribed treatments, denying "prescribed surgeries to save his sight," and that it "knowingly refused treatments which have resulted in permanent disabilities and disfigurement." Compl. at PageID.38. The crux of plaintiff's claim is that "Defendant Corizon is ultimately responsible for the Plaintiff's health care." *Id.* Plaintiff's claim against Corizon fails. First, plaintiff seeks to hold Corizon liable under a theory of vicarious liability for the acts of the individual medical providers at DHW. It is well settled that a § 1983 action cannot be based on a theory of *respondeat superior*. *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 691 (1978); *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 80-81 (6th Cir.1995). Second, a plaintiff who sues a private or public corporation for constitutional violations under § 1983 must establish that a policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir.1996). Thus, in order to state a § 1983 claim against Corizon, plaintiff must allege the existence of a policy, practice or custom that both violated his Eighth Amendment rights and resulted in an injury. *See Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir.2001) (a prisoner's § 1983 claim against a corporation providing medical services at a state correctional facility must "be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights"). Plaintiff has not established that Corizon had any policy, practice, or custom that both violated his Eighth Amendment rights and caused him injury. Accordingly, Corizon's motion for summary judgment should be granted.

### III.    Recommendation

For these reasons, I respectfully recommend that the motion for summary judgment filed by defendants Eklin, Sherman, Pratt, Douglas, Saur, Wilson, Kingsley, Zaborowski, Bourque, Hansen, Sobeck, RN Dunning-Meyers, RN Buren, and Dr. Borgerding (ECF No. 180) be **GRANTED**.

I further recommend that the motion for summary judgment filed by Dr. Bomber, Dr. Whiteman, and Dr. Tan (ECF No. 183) be **GRANTED**.

I further recommend that plaintiff's action be **TERMINATED**.

Dated:  September 18, 2018              /s/ Ray Kent
                                                          RAY KENT
                                                          United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).